16386

CAROLINA LIFE INS. CO. v. BANK OF GREENWOOD
(60 S. E. (2d) 599)

278

*Messrs. Grier, McDonald, Todd & Burns,* of Greenwood, *for Appellant,*

*Messrs. N. A. Turner* and *Edward A. Harter,* of Columbia, and *J. Perrin Anderson,* of Greenwood, *for Respondent,*

July 18, 1950.

BAKER, Chief Justice.

Omitting the formal allegations, the complaint of the plaintiff-respondent alleges :

"3. That the plaintiff has carried an account with the defendant Bank for a number of years and on or about November 28, 1942, an agreement was made between the plaintiff and the defendant Bank whereby the plaintiff on or about that date deposited the sum of two thousand five hundred and no/100 ($2,500.00) dollars with the said defendant in a so-called dormant account and the defendant agreed to recognize the signatures of only certain officials of the plaintiff company on checks against said account, and defendant further agreed, in consideration for said deposit, to make no service charges  for handling the plaintiff's ordinary account with said defendant bank.

"4. That since said date the defendant Bank has allowed checks to be drawn against said bank by other than duly authorized officials of the plaintiff company and has made service charges against the plaintiff, all in breach of the aforesaid agreement and by reason of which the plaintiff has been damaged in the sum of one thousand six hundred eight and 73/100 ($1,608.73) dollars.

"5. That due and timely demand has been given to the defendant for this amount and has been refused, and that the defendant is thereby indebted to the plaintiff in the sum of one thousand six hundred eight and 73/100 ($1,608.73) dollars, and costs.

"6. That plaintiff's loss as aforesaid, or the greater part thereof, was caused by the negligence of the defendant Bank in causing said two accounts to be jumbled and in futher negligently allowing checks by other than duly authorized officials of the said company to be charged against the so-called dormant account."

The answer of the defendant-appellant admits the formal allegations of the complaint, but denies all and singular the other allegations therein contained except as thereinafter admitted.

"3. That defendant admits that on or about November 28, 1942, plaintiff deposited with it the sum of twenty-five hunderd ($2,500.00) dollars, subject to withdrawal by checks signed by certain designated persons whose signatures were furnished the defendant on one of its regular signature cards for the use of depositors; that while said deposit remained dormant defendant agreed to waive or not charge the regular service charges applicable to ordinary checking accounts, but it was agreed that a charge of twenty-five (25¢) cents for each check drawn against the account and returned for insufficient funds should be made against the account at the close of the business day upon which the item should be presented: that defendant, upon receipt of said sum, credited the same to the regular or ordinary checking account of the plaintiff and issued therefor its duplicate deposit ticket and delivered the same to plaintiff; that the said ordinary account of the plaintiff in which the said sum was deposited had been carried in the defendant bank for some time prior to said special deposit; that said account has since shown many credits and debits and monthly statements of the said account, showing and in-

cluding the deposit of the sum of twenty-five hundred ($2,-500.00) dollars as aforesaid, were thereafter promptly and in due course periodically furnished the plaintiff, together with all cancelled checks drawn against said account by agents and employees of the plaintiff; that at no time, until on or about November, 1946, or about five (5) years later, did the plaintiff make any complaint in respect to said special deposit, or question any withdrawal from said account by any officer, agent or employee of the plaintiff; that all checks charged to said amount, including any which may have reduced the said special deposit below the original amount thereof, were for sums duly remitted to and received by plaintiff and were drawn by its agents and employees having charge of said account; that plaintiff by reason of said facts and circumstances, and otherwise, had full knowledge of the handling of the said special deposit and of the alleged impairment of same in and through its ordinary checking account, as aforesaid, and acquired such knowledge and information in respect to the same for about five (5) years before making any complaint or taking any exception in respect thereto, and by reason thereof cannot now be heard to complain and object and to bring and maintain this suit to recover the alleged impairment of said special deposit."

Such confusion as exists in this case, and that which furnishes some slight basis for the position of the appellant that the amount claimed by the respondent above the sum of $118.62, and the amount for which judgment was rendered above the said sum of $118.62, was for special damages which it alleges are not recoverable under the allegations of the complaint, granting that the contract had been breached by the appellant, arises from the manner in which the respondent undertook to prove the allegations of its complaint, and disprove the defenses set out in the answer of the appellant. The appellant offered no testimony.

We think it is clear that the complaint alleges that respondent had suffered damages in two ways by reason of the appellant's breach of its contract (1) in honoring checks against the $2,500.00 deposit signed by a person or persons not authorized to sign checks against this fund, and (2) in continuing to make service charges.

There appears to be no question about $118.62 being the amount of the service charges which should not have been collected from the respondent, and it further appears that there is no dispute here as to $1,022.26 being the correct amount of the depletion of the $2,500.00 deposit by reason of checks paid on unauthorized signatures. We assume that this amount was arrived at by subtracting the balance as shown on deposit by respondent in appellant bank from $2,500.00; otherwise the complaint would have demanded the full $2,-500.00, plus the service charges, and judgment would have been rendered accordingly. In other words, while over the period of time involved, unauthorized checks against the $2,500.00 deposit were paid totaling a sum much greater, yet $1,022.26 was the amount of damage suffered by the respondent by reason of the breach of its contract by appellant in the payment of checks signed by a person or persons unauthorized to sign such checks. None of the officers of the respondent who were authorized to sign checks against this $2,500.00 deposit had ever signed a check in any amount against this deposit or dormant account until after the commencement of this action, and payment of such check, which was in the sum of $2,500.00, was refused, the endorsement placed thereon reading: "Insufficient funds-account in litigation." (The letter transmitting the dormant deposit of $2,-500.00 to the appellant designates and limits the officers of the respondent who were authorized to sign checks against this deposit to two, but the record as a whole indicates three, but this is immaterial since no part of this deposit was withdrawn on checks of those authorized to sign such checks.)

Appellant takes the further position that the unauthorized checks paid by it purchased Cashier's checks payable to the respondent, and was received by the respondent, but overlooks the fact that in this way the district cashier of the respondent was thus enabled to withhold funds of the respondent and not deposit such funds, and avoid disclosure of such act or acts, constituting defalcations.

On motion of respondent (plaintiff), this case was referred to the Master in Equity of Greenwood County to take the testimony and report his findings of fact and conclusions of law to the Court of Common Pleas, with the right reserved to the appellant (defendant) upon the coming in of the Report from the Master, to move the Court for a trial of any legal issues if it be so advised.

The Master took the testimony, and transmitted it with his recommendation in accord with the order of reference, his recommendation being that the respondent have judgment against the appellant in the total sum of $1,371.51, and costs. On appeal from the report of the Master, the Circuit Judge affirmed it as modified, that is, ordered judgment in favor of the respondent (plaintiff) against the appellant (defendant) for the $118.62 wrongful service charges, and $1,022.26 representing the damage suffered by the respondent by the negligence of the appellant (defendant) in the breach of its contract in paying checks drawn against the dormant deposit of $2,500.00 and signed by a person or persons who had no authority to sign checks against this deposit.

The testimony taken before the Master in Equity, the admissions in the answer of the appellant and the record as a whole establish the facts hereinbefore and hereinafter stated.

The respondent is a corporation of this State, with headquarters in Columbia and a District Office in Greenwood. Among the personnel of the District Office is a woman cashier who, though employed and dismissed in the discretion of the Manager of said District Office, appears to have

been otherwise free of his control. Her duties were to receive all funds brought in the office, to pay certain local bills, and to remit the balance weekly to the Home Office along with a report showing receipts and disbursements. In the fall of 1942, and for some considerable time prior thereto, this cashier and her predecessor carried a checking account in the appellant bank in the name of the plaintiff, into which account presumably all funds received were deposited, and for which she was responsible, and she alone was authorized to draw checks against this account except in cases of emergency, and then the Manger would issue a check against the account. In paying local bills this cashier customarily drew checks against the account in the bank, but her weekly remittance was required to be made by Cashier's checks. To do this she would draw a check against the bank account, which was carried in the name of respondent, for the amount of money she was due to send to the Home Office with the week's report and obtain a Cashier's check payable to respondent for that amount. Her report had to be mailed either Friday or Saturday of each week, and hence the account in the appellant bank was at its lowest ebb on week ends.

Due to the fact that practically all funds in this account were checked out at the end of every week, the appellant bank found it necessary to charge for its services in carrying this account. In the fall of 1942 the respondent and the appellant entered into negotiations for ways and means of eliminating these service charges, and arrived at the agreement alleged in the complaint and admitted in the answer. Pursuant thereto, the Home Office of respondent sent to the appellant on November 27, 1942, the sum of $2,500.00, which was to be deposited in an account separate and distinct from that carried by the cashier of the District Office, and was to be what is known in banking circles as a dormant account. According to the letter transmitting this deposit, there were only two officers of the respondent company who had the authority to draw checks against this account, these being Ames Haltiwanger, Vice President and Treasurer and

Robert L. Avinger, Assistant Treasurer. This deposit was acknowledged on December 2, 1942, and respondent's Home Office was sent a duplicate deposit ticket or slip to cover; and at the same time a signature card for specimens of signatures of those authorized to sign checks against this account was forwarded. It appears that in returning this card, a Mr. Kohn, another officer of the Company, was also authorized to sign checks against the $2,500.00 deposit. None of these officers ever signed a check against this deposit except as hereinbefore stated.

Upon the receipt of said $2,500.00 deposit the appellant bank placed the money not in a separate account, but in the account being carried by the Greenwood District cashier in the name of respondent. There was no occasion for appellant bank to send any bank statement to the Home Office in reference to the $2,500.00, but in the bank statement of the account carried by the District cashier, the statement delivered to her showed the $2,500.00 deposit in that account, but this information did not reach the Home Office.

Due to the shortage of clerical assistance during the war, no thorough audit of the Greenwood District Office was made from the date of this deposit of $2,500.00 until the latter part of October or the first of November, 1946. It was then that the respondent's auditor discovered the jumbling of the two accounts. Prior to the audit he did not know of the sending of the $2,500.00 deposit to the Bank of Greenwood, nor the purpose therefor. Finding the cashier with too much money in her account, and from investigation through the appellant bank and the Home Office, he determined that her surplus was attributable to this fund, and it had been considerably impoverished.

As early as August 27, 1945, a Mr. Dendy of the Home Office made a "spot check" of the District Office and found that the cashier had in her account that day a net balance of $1,688.36. August 27, 1945, was on Monday of the week, but it still did not occur to him that she should not have had

anything more than a small balance, if any amount, in the account.

In discovering the shortage in reference to the $2,500.00 deposit, that is, that the appellant bank had been paying checks against this $2,500.00 deposit signed by respondent's District cashier, the auditor also discovered that the bank had charged and collected service charges in the sum of $118.62 after having entered into the agreement not to make such charges, and there is no question thereabout involved in this appeal.

The recommendation of the Master in Equity for Greenwood County as to the amount of the damage suffered by respondent on account of the breach of the contract by the appellant in the payment of checks against the $2,500.00 deposit signed by a person unauthorized to sign checks on this account, was modified by the Circuit Judge. The amount thereof ($1,022.26) as found by the Circuit Judge is not questioned in so far as the amount is concerned. Therefore, we also accept as the shortage in the $2,500.00 deposit the sum as aforestated.

The broad question in this case is whether under the pleadings and testimony, the respondent can, in this proceeding, recover judgment against the appellant for the amount of its loss by reason of the negligent breach by the appellant of its contract in the paying of checks against this dormant deposit, signed by a person who was unauthorized to sign checks thereon.

This broad question may be broken down into the issues stated by the respondent in its statement of the "Questions Involved," which issues are as follows:

"1. Were the losses resulting from unauthorized withdrawals negligently permitted by defendant from plaintiff's Twenty-Five Hundred ($2,500.00) Dollar bank account special damages?

"2. Did plaintiff receive the benefits from the unauthorized withdrawals where they were used by the plaintiff's District Office Cashier to cover balances due the Home Office?

"3. Has defendant bank made out a case of estoppel by reason of:

"(a) The deposit slip given Carolina Life Insurance Company for $2,500.00 which was agreed to be held for a specific purpose?

"(b) The fact that monthly bank statements were rendered the District Office of plaintiff but not the Home Office?

"(c) Because of the 'spot check' made by plaintiff's risk inspector, Mr. Dendy, on August 27, 1945?"

∎ The respondent had the right to maintain separate accounts in the appellant bank. In *Hiller v. Bank of Columbia,* 92 S. C. 445, 75 S. E. 789, 790, it is stated:

"When Mrs. Hiller made two accounts with the bank, under an agreement that John Hiller should have the right to draw, as her agent, on one of them, the bank had no right to charge checks drawn by John Hiller to the other account. Mrs. Hiller had the right to hold the funds deposited on the other account subject to her own control; and that right could not be defeated by the unauthorized action of John Hiller and the bank. This right of a depositor to separate and control his accounts is established in this State. *Fogarties & Stillman v. President, etc., of State Bank,* 12 Rich. 518, 78 Am. Dec. 468; *Simmons Hardware Co. v. Bank,* 41 S. C. 177, 19 S. E. 502, 44 Am. St. Rep. 700; *Callahan v. Bank,* 69 S. C. 374, 48 S. E. 293, 2 Ann. Cas. 203; *Bank of Spartanburg v. Mahon,* 78 S. C. 408, 59 S. E. 31."

Although appellant bank did not enter the $2,500.00 deposit of the respondent in a separate account, as was its duty to do, but on the other hand carried such deposit in the checking account of the respondent, against which account

its District cashier was authorized to issue checks, appellant had no right to pay checks drawn by such cashier which would reduce the account below the sum of $2,500.00, and when appellant bank paid checks against this $2,500.00 deposit, signed by respondent's District cashier, it became liable for the consequences.

The appellant contends that such damages as the respondent suffered were not general damages, but were special damages, which were not pleaded. It is stated in appellant's brief: "The *possibility* that an unauthorized withdrawal of any part of the $2,500.00 by any person other than the three authorized to check against it might produce such a situation which would cause loss to the plaintiff (respondent) cannot be said to have been in contemplation of the parties, and there is no allegation in the complaint in respect to any such development." Apropos of such position, we quote from *Palmetto Compress & Warehouse Co. v. Citizens & Southern National Bank,* 200 S. C. 20, 25, 20 S. E. 2d 232, 234:

"There is, as indicated, a controversy preliminary to the meat of the case. Respondent contends that the appellant's complaint is upon contract and that it cannot rely upon so-called negligent acts of the bank. As before stated, the learned Circuit Judge took this view and said in his order directing a verdict for the defendant that he construed the complaint to be a cause of action upon a contract, the agreement between the depositor and the bank, evidenced by the writings aforementioned; and that the allegations of negligence were relevant only to, and a part of, the allegation of violation of the contract or agreement whereby the bank obligated that funds should be withdrawn from the deposit account only upon two signatures.

"However, we agree with appellant that it is entitled to whatever relief its allegations and proof warrant. Our system of Code pleading plainly requires this result. Section 477 enjoins the liberal construction of a pleading in favor of the pleader, regardless of what form of action or plea

he denominates it. Decisions in Code footnote; *Cooper v. Baxley*, 194 S. C. 270, 9 S. E. 2d 721, and cases cited; see also *Lorick & Lowrance v. Caldwell*, 85 S. C. 94, 67 S. E. 143 and *Furman v. A. C. Tuxbury L. & T. Co.*, 112 S. C. 71, 99 S. E. 111."

Implicit in the contract for the deposit in issue here was the limiting to certain officials of respondent the authority to sign checks against this $2,500.00 deposit, and thus assure that it would not be used except for purposes of the Home Office of respondent, and for its benefit. The result of what occurred to this deposit was one of the possibilities which the respondent was guarding against in limiting the persons authorized to sign checks against this deposit to certain officers of the respondent; and the damages and loss suffered by respondent necessarily resulted from the breach of the contract by the appellant bank in paying checks against this fund signed by a party not authorized to issue checks against this fund.

We quote from *Henry Sonneborn & Co. v. Southern Railway Co.*, 65 S. C. 502, 506, 44 S. E. 77, 78: "In the case of *Lipscomb v. Tanner*, 31 S. C. 49, 52, 9 S. E. 733, the Court said: 'It is not always easy to determine whether damage is or is not special. The cases upon the subject are full of nice distinctions. We have seen no clearer definition or description of it than the following: "The general allegation of damages will suffice to let in proof and to warrant recovery of all such damages as naturally and necessarily result from the unlawful act complained of; the law implies such damages. But where damages do not necessarily result from the act complained of, and consequently are not implied by law, the plaintiff must state the particular damage sustained in order to introduce testimony in regard to it; the rule is to avoid surprise," &c. See 5 Am. & Eng. Ency. Law 49, and very full notes.' Such is the rule established by the decisions in this State. *Alston v. Huggins*, 3 Brev. 185; *Rowand v. Bellinger*, 3 Strob. 375; *Loeb v. Mann*, 39

S. C. 465, 468, 18 S. E. 1; *Mood v. Telegraph Co.,* 40 S. C. 524, 528, 19 S. E. 67; *Pearson v. Spartanburg Co.,* 51 S. C. 480, 484, 29 S. E. 193."

And in *Hobbs v. Carolina Coca-Cola Bottling Co.,* 194 S. C. 543, 548, 10 S. E. 2d 25, 27, it is stated: "It is generally agreed that a general allegation of damages will suffice to let in proof and to warrant recovery of all such damages as naturally, logically and necessarily result from the unlawful act complained of; the law implies such damage. But where damages do not necessarily result from the act complained of, and consequently are not implied by law, the plaintiff must state the particular damage sustained in order to introduce testimony in regard to it. The rule is to avoid surprise. *Sonneborn & Co. v. Southern R. Co.,* 65 S. C. 502, 44 S. E. 77; *Lipscomb v. Tanner,* 31 S. C. 49, 9 S. E. 733; 15 Am. Jur., Section 305, Page 747."

The appellant could not have been taken by surprise in its defense of this case since paragraphs 3, 4 and 6 of the complaint plainly put it on notice that the damages suffered by respondent, other than for service charges collected in violation of the contract, was the result of appellant's breach of its contract in honoring and paying checks signed by a' person unauthorized so to do and charging said checks against this dormant account of $2,500-.00. Even though appellant did not carry the $2,500.00 deposit of respondent in a separate account, the account of the respondent in appellant bank was dormant as to this amount, and any check which would reduce the account below said sum would necessarily have to be signed by one of the officers of respondent authorized to sign a check against such deposit. The honoring of checks which reduced the balance in this account below $2,500.00 was a breach of the contract on the part of appellant bank, and resulted in loss to the respondent as hereinbefore pointed out.

Appellant, in effect, takes the further position that since the checks issued against this $2,500.00 deposit by respondent's District cashier purchased Cashier's checks payable to the respondent, it thereby received the benefits thereof. Under the facts of this case, such reasoning is unsound. It is admitted in appellant's printed brief that the instant suit is based upon the breach of a contract of deposit, and that the alleged breach consisted of the negligent deposit of the $2,500.00 fund not in a separate or special account, but by entering it to the credit of the general checking account carried in appellant bank and against which respondent's District cashier was authorized to issue checks; and in allowing an unauthorized person (this District cashier) to check out the funds of the jumbled accounts so as to use a portion of said $2,500.00 deposit.

We are unable to agree with appellant that the case of *Industrial Savings Bank v. Peoples Funeral Service Corporation*, 54 App. D. C. 259, 296 F. 1006, 1007, (referred to in the report of the Master) lends any aid to its position here. To the contrary, under the facts of this case, it is favorable to a recovery by the respondent. We quote from said case. "The record discloses without contradiction that at the time the check was drawn the corporation was indebted to Warfield & Rohr Company in the amount of the check; that the president of the corporation, one Richardson, took the check to the Rohr Company for the purpose of paying the debt; that he there learned that the debt was somewhat more than the amount named in the check; that the check was then indorsed by the Rohr Company and delivered to him; that he gave his check in place of it, for the amount of the Rohr Company's bill, and subsequently cashed the corporation's check. Thus the amount paid upon the check went to discharge a debt of the corporation. About this there is no dispute. The court instructed the jury that the only question in the case was whether the bank was negligent in paying the check, and that, if it knew that the check should have been signed by the president and treasurer, and paid

it 'without those two signatures,' the verdict should be for the plaintiff. In this we think the court erred. By paying the check a debt of the corporation was discharged; therefore it sustained no damage by the act of the bank in paying it. To support an action based on negligence there must be, not only the negligent act, but a consequential injury, which is the gravamen of the charge. *Ochs v. Public Service Railway Co.,* 81 N. J. L. 661, 80 A. 495, 36 L. R. A., N. S., 240, Ann. Cas. 1912D, 255. To this rule there is no exception so far as we know. Of course, if there was testimony tending to show that the corporation was damaged by the payment of the defectively signed check, a different question would be presented."

Apposite to this case is that of *Life Insurance Co. of Virginia v. Edisto National Bank,* 166 S. C. 505, 165 S. E. 178, 179. In that case the insurance company sent to its agent, D. B. Edge, a check for $199.58, payable to the order of Susie Castleberry, and for delivery to her, in payment of the cash surrender value of three policies. Instead of delivering the check to the payee thereof, Edge forged her name thereto, endorsed it and placed it to the account maintained in his name as agent in the defendant bank. He thereupon drew a check on that account payable to Life Insurance Company of Virginia and forwarded it to said company in payment of insurance premiums collected by him as its agent. This check was honored upon presentation. Edge also paid to Mrs. Castleberry or her agent the sum of $43.58. After the Life Insurance Company of Virginia had made good to Mrs. Castleberry the balance of the cash surrender value of the policies, $156.00, it sued the Edisto Bank for such sum, basing its suit on the negligence of the bank in paying the check for $199.58 on a forged endorsement, and its guarantee of the endorsements thereon. The bank by way of defense contended that since Edge had used the Castleberry check to create the fund from which he made payment of his indebtedness to the insurance company in an amount

greater than the Castleberry check, the insurance company had received the benefit of same, and therefore could not recover against it. The Court in disposing of this contention stated: "The Edisto Bank futher contends that, even if the indorsement of the check was a forgery, the insurance company was the beneficiary. This contention will not stand analysis. It will be conceded that the check for $233.36 sent to the insurance company by Edge included the proceeds of the $199.58 check; still there can be no reasonable doubt that it went to pay obligations of Edge to the insurance company, and in no wise went for the purpose of replacing the money diverted from it by Edge's unlawful use of the Castleberry check."

The indebtedness of Edge to the Life Insurance Company of Virginia was for premiums which he had collected for this company, and therefore the situation of respondent's District cashier in the instant case is not only analogous to his situation, but is practically the same.

Appellant apparently overlooks the correspondence between the respondent and it, culminating in the $2,500.00 deposit, and undertakes to make the deposit slip furnished the respondent at its Home Office the contract, the said deposit slip being in the customary form and not containing any evidence that the deposit was for a special account, or was made and received under an agreement of any kind which distinguished it from the ordinary deposit made in the appellant bank; and that respondent is therefore estopped from recovering any damages suffered by reason of the appellant placing this deposit to the credit of the account carried in respondent's name by its District office, and honoring checks signed by its District cashier, against the same.

The case of *Fort v. First National Bank of Batesburg,* 82 S. C. 427, 64 S. E. 405, 406, cited by respondent, by analogy settles such contention of the appellant against it. In the *Fort case* the facts, briefly stated, were: One Coats offered to sell Fort a house and lot for $850.00, and Fort was

informed that defendant's bank had a small mortgage thereon, and that one Bayly claimed a mechanic's lien thereon for a small amount, for which a suit was then pending. Not desiring to assume the risk of this controversy, Fort went to the defendant bank where it was suggested by the bank and agreed that the purchase price be deposited to the credit of Coats, and the bank would withhold sufficient of the deposit to protect Coats against the mechanic's lien until the controversy was settled. The purchase price was paid and bank gave Coats, the seller, the usual deposit slip for the amount. The mortgage was paid by check of Coats, and later he withdrew all of the remainder of the account by checks. Bayly was successful in establishing his mechanic's lien, and Fort was forced to pay it, with costs. Fort thereupon brought suit to recover from the bank the amount he had been forced to pay on account of the mechanic's lien. From a judgment recovered by Fort, the bank appealed. One of the contentions of the bank was that the deposit slip was the contract between the bank and the depositor, and that the bank was bound to honor the depositor's checks to the extent of the deposit.

In ruling against such contention of the bank, and under the facts of that case, the Court stated:

"The deposit slip is a mere acknowledgment by the bank that the amount named has been received (3 Ency. Law 830), and does not purport to embody the contract between the parties, and cannot affect the rights of plaintiff under his alleged agreement with the depositor and the bank officers.

"The contemporaneous agreement among the plaintiff, the depositor, and the bank officers affected the deposit, with the trust assumed by the bank to hold sufficient of it to protect plaintiff against the Bayly claim."

As stated in respondent's brief, in the instant case, the deposit slip was a mere acknowledgment by the appellant that the $2,500.00 had been received, and does

not purport to embody the contract thereabout between respondent and appellant; and was not sufficient to put respondent on notice that this money had not been placed in an account separate and apart from the account carried by its District office in appellant bank. Hence there is no basis for the application of the doctrine of estoppel.

Monthly bank statements were rendered the District office of the respondent, but not the Home Office. It was through these monthly statements that respondent's District cashier learned, without knowing from whence the deposit had come, that $2,500.00 had been deposited to the credit of the account carried in appellant bank in the name of the respondent. No such information reached the Home Office of the respondent, and under the agreement had with appellant, there was no occasion for the respondent to make any inquiry of either the appellant or an examination of the records of its District office in Greenwood in reference to this deposit. We quote with approval from the order of Judge Griffith in affirming the report of the Master in Equity. "Plaintiff's local cashier is the only person connected with plaintiff who acquired any knowledge of defendant's wrongful handling of this account, prior to plaintiff's audit and the resulting discovery of the shortage. Under the circumstances of this case, notice to the plaintiff's local cashier cannot be imputed to her principal, for the reason that under the contract defendant had specific notice that the local cashier had no authority or responsibility with regard to this special deposit; and, futhermore, that the local cashier's knowledge could not be communicated to her principal without defeating her purpose of wrongfully withdrawing the account.  *  *  * Moreover, defendant had knowledge of the wrongful withdrawals and participated therein.  *  *  *."

The "spot check" of respondent's risk inspector, Mr. Dendy, on August 27, 1945, was in no sense an audit of the account carried by its District office in the name of respondent in appellant bank, and Mr. Dendy had no knowledge of

the $2,500.00 dormant deposit. His "spot check" did not disclose either the appellant bank's error or the defalcation of the respondent's District cashier. Therefore, there is no basis for appellant's contention that the respondent remained silent when it should have spoken, and before it did.

All exceptions are overruled, and the judgment appealed from is affirmed.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.